## No. 6553.

M. M. ADA CALHOUN VS. MECHANICS' AND TRADERS' BANK.

A married woman will not be bound by her mortgage note executed by her authorized agent, when it appears that she was not authorized by the judge of her domicile to empower the agent to execute such a note, unless the holder of the note shows affirmatively that the consideration of the note inured to her separate benefit.

The agent of a widow, acting solely in virtue of a mandate executed by her while she was a married woman, can not bind her to any greater extent, as a widow, than he could have bound her as a married woman.

To maintain a proceeding *via executiva* against the property of a married woman, in virtue of a mortgage executed by her agent, either the act of the judge authorizing her to so empower the agent, or her ratification of the agent's act after she became a widow, or the fact that the debt inured to her separate benefit, must appear in evidence in the form of an authentic act, or of a judgment of some competent court.

The court can not, of its own motion, change the form of a proceeding from an executory, to an ordinary one. Such a change can not be made without the assent of the seizing creditor.

The executory proceeding may be arrested by injunction, and if, on being required, the defendant prove any of the facts set forth in article 742 of the Code of Practice, the order of seizure and sale will be revoked, and the plaintiff condemned to pay costs.

APPEAL from the Ninth Judicial District Court, parish of Grant. *Osborn, J.*

*F. W. Baker* and *W. S. Benedict* for plaintiff and appellee.

*Singleton & Browne* for defendant and appellant.

His Honor, FRANCIS A. MONROE, judge of the Third District Court for the parish of Orleans, called upon to supply the place of Chief Justice MANNING, recused, and to aid in determining the cause, pronounced the judgment and decree of the court.

MONROE, J. On the 27th of December, 1866, Mrs. Mary Smith Calhoun and her husband, Meredith Calhoun, appeared before the U. S. Consul in Paris, France, and executed an act of procuration by which they appointed their son, William S. Calhoun, their agent and attorney in fact, and authorized him to take charge of, and conduct, all business affairs pertaining to them in America, whether the same relate to real or personal property, or be of any other nature or kind whatsoever; further authorizing him "to sell, assign, and transfer any and all real estate, lands, tenements, and hereditaments, to them, or either of them belonging," and to mortgage or lease the same; " to make, execute, acknowledge, and deliver any contracts, agreements or covenants, and to sign, seal and deliver all conveyances, deeds, leases, mortgages or other instruments of writing necessary for the execution of the power" granted to him.

In 1869 Meredith Calhoun died in Paris, where he and his wife had

Calhoun vs. Mechanics' and Traders' Bank.

continued to reside, and, upon the 12th of May, 1870, Wm. S. Calhoun, the agent above mentioned, claiming to act under and by virtue of the power of attorney referred to, as the agent of his mother, executed three promissory notes of $5000 each, dated at New Orleans, May 12th, 1870, and made payable to his order as agent, upon November 1 and December 1, 1870, and January 1, 1871, respectively, which notes were indorsed by him, in conformity to their tenor, in blank, and were subsequently indorsed by one James N. Nevin.

In order to secure the payment of these notes, the said Wm. S. Calhoun, as agent, executed a mortgage upon four plantations in the parish of Grant, being a portion of Mrs. Calhoun's paraphernal estate; and known as the " Smithfield," " Farine," " Mirabeau," and " Meredith" plantations, respectively.

This act sets forth that said Wm. S. Calhoun appeared before P. C. Cuvellier, notary, in New Orleans, May 14, 1870, and declared :

" That he was the agent and attorney in fact of his father, Meredith Calhoun, who has since died, to wit: on or about the 14th of May, 1869, and as the attorney in fact of his mother, Mary Smith Calhoun, now the widow of said Meredith Calhoun, as will appear by an act of procuration from said Meredith Calhoun to said appearer, passed before me notary September 23, 1865, and by another act of procuration, executed jointly by said Meredith Calhoun and wife, at Paris, France, under date of the 27th of December, 1866, certified to by the Consul of the United States at Paris, aforesaid, and annexed to an act in this office, dated February, 4th, 1869.

" That said Mary Smith Taylor, widow of said late Meredith Calhoun, owns as her separate paraphernal property those certain plantations situated in the parish of Rapides aforesaid, hereinafter more fully described, the administration of which she has resumed and confided to the said appearer as her agent and attorney in fact. That for the purpose of working and successfully cultivating the said plantations during the current year, it has become necessary for said appearer in behalf of his said constituent to procure advances in money and supplies, which said advances James N. Nevin, merchant of this city, has consented to make to an amount not exceeding the total sum of $15,000."

Further proceeding, the act recites the delivery of the notes mentioned to the said Nevin, and purports to mortgage the four plantations belonging to Mrs. Calhoun in favor of any holder or holders of said notes " in order to secure the payment of said notes and all interest," etc., and also " any and all further advances which have been or may be made by said J. N. Nevin to said Mrs. Calhoun," etc.

In April, 1875, defendants herein obtained from the district court sitting for the parish of Grant an order for the seizure and sale of said

plantations, based upon the two notes, already described as maturing November 1, 1870, and January 1, 1871; and, in May, 1875, an injunction was issued from the same court, upon the application of the plaintiff herein, restraining the execution of said order.

It is this injunction which is now before the court.

Plaintiff in injunction alleges that Mrs. Mary Smith Calhoun died upon June 10th, 1871, and that petitioner and William Smith Calhoun are her sole children and heirs; and, that by notarial act of May 27th, 1873, petitioner acquired from said Wm. S. Calhoun all his right, title, and interest in and to the estate which forms the subject of this litigation.

In support of the application for injunction, various grounds are set forth which it is unnecessary to recapitulate at length. Those which are of immediate importance may be stated, in substance, as follows, to wit:

1. That the power of attorney under which Wm. S. Calhoun assumed to act was not executed in conformity to the laws of this State; is informal and insufficient; and did not authorize said Wm. S. Calhoun to execute said notes and mortgage, or, in any manner, to bind said Mrs. Calhoun or her property.

2. That said notes and mortgage were executed pursuant to a fraudulent conspiracy between Wm. S. Calhoun and James N. Nevin, the original holder of said notes, the object of which was to defraud the said Mrs. Calhoun, who received no consideration therefor.

For answer, defendants deny generally the allegations of the petition, and aver that the injunction was obtained for delay, and is but a repetition of previous attempts to obstruct the collection of their claim. They pray for its dissolution with damages.

As a preliminary to the consideration of the case thus presented there are certain matters, not disputed, which may be stated as facts. These are:

That the notes and mortgage upon which defendants are proceeding were not executed by Mrs. Calhoun in person.

That said notes and mortgage were executed by Wm. S. Calhoun, claiming to act as the agent of Mrs. Calhoun, under and by virtue of the power of attorney mentioned.

That said power of attorney was executed, as it purports to have been, by Mr. and Mrs. Calhoun, and that Mrs. Calhoun did not obtain the sanction of any Louisiana Judge in signing said act.

The pleadings, and the facts thus stated, present questions of law which may, and, in fact, must be determined without reference to issues which might arise upon a further investigation of the record. The first of these questions is as to the capacity of Mrs. Calhoun, counsel for

plaintiff claiming that the act of procuration under which the notes and mortgage held by defendant were executed, was not made in conformity to law, and did not confer the power claimed to have been exercised under it, for the reason that Mrs. Calhoun was legally incapacitated from either exercising or delegating such power.

It is manifest that Mrs. Calhoun could have delegated no greater power than she herself possessed. If, therefore, at the date of the procuration, she was without power to execute instruments having the effect claimed for the notes and mortgage executed in her name by William S. Calhoun, she clearly could not have delegated such authority to him.

The question then is, had she the power to execute such instruments.

To say that the provisions of law governing the rights and obligations of married women were enacted with reference to the husband is to utter a truism. The intention of such laws is doubtless, in part, to recognize the marital authority of the husband, and, in part, to protect the wife against the abuse of that authority. It can not be supposed that they were intended to deprive her of the use and enjoyment of her own property, and it may be said that they were not intended to prevent her using such property for the benefit of third persons, other than the husband.

Certain it is, however, that with reference to the power to contract, according to the textual provisions of our Code, the incapacity of married women is the rule, their capacity the exception.

C. C. 1782 provides that " All persons have the power to contract except those whose incapacity is specially declared by law. These are persons of insane mind, those who are interdicted, minors, and married women."

The general disqualification of married women could hardly be made more distinct or emphatic than by this language and classification, and it follows, as a necessary consequence, that whatever powers they may possess in this State, in regard to the formation of contracts, must proceed from special enacting statutes, susceptible of being construed with that just quoted. That there are such statutes can not be doubted; in fact, by the provisions of the Code itself, married women are specially authorized to do many things; but, in almost every instance the power thus conferred on them is guarded by provisions prescribing specifically the form and manner in which those things are to be done, and as if to close every possible avenue for misconstruction upon this point, C. C. 133 provides that " Every general authority, even though stipulated for in the marriage contract, is void, except so far as it respects the administration of the property of the wife." ·

For the purposes of the present case it suffices to say that prior to

1855 there was no special provision of the Code (of 1825) authorizing married women to borrow money or contract debts, and they were only held liable upon such contracts upon its being shown affirmatively that the consideration inured to their separate benefit. In the case of "Hellwig vs. West," 2 A. p. 1, it was said that they might be made liable for frauds committed by them, although, as the case was ultimately decided upon rehearing (2 A. p. 3) the opinion upon that point was unnecessary.

. In fact, up to the time of the decision of the case of "Zuntz vs. Cornen," 10 A. 433, there is probably not one instance in which a married woman had been held liable for a debt upon her contract alone; the basis of the judgments in such cases being affirmative evidence that the consideration of the contract inured to the benefit of the married women who were sought to be made liable.

In the case referred to (Zuntz vs. Cornen) it was held that an authentic act of mortgage executed by a married woman, with the authorization of her husband, was sufficient to justify the issuance of an order of seizure and sale, and that such an order could not be arrested by an unsworn statement in a rule, that the notes to secure which the mortgage had been given were without consideration, the court considering that she should have proceeded by injunction.

Even in that case, however, it was distinctly stated that (to quote the language of Judge Spofford, concurring with Judge Ogden):

"Where an issue is properly made up between the parties, the burden of proving the affirmative, that the debt of the wife (particularly where it has been contracted conjointly with the husband) inured to her separate benefit, has been thrown upon the creditor."

This decision was rendered in 1855, and since the act passed during that year authorizing married women to contract debts, etc., is not referred to, it is more than probable that it had not been called to the attention of the court whilst the matter was under consideration. However that may be, the decision only goes to the extent of requiring an issue to be made properly (and the proceeding by injunction is indicated as the proper method of raising the issue), to throw the burden of proof upon the party seeking to hold a married woman liable upon an authentic act of mortgage.

By act number 200 of 1855, however, a method was provided by which married women were authorized to borrow money, contract debts, and mortgage their property, by contracts made under certain conditions, which contracts so made were constituted full proof as against such married women, and were made as binding in every respect as though made by *femmes soles*. In other words, the effect of that act, as since interpreted, was to relieve parties contracting with married women in accordance with its provisions from the necessity of offering any fur-

ther proof than the contract itself. See "Rice vs. Alexander," 15 A. p. 54; "Hardin vs. Wolf & Cerf," 29 A. 334.

The particular conditions prescribed for the contracts contemplated by the act referred to (and which is substantially embodied in arts. 126, 127, 128, of the Civil Code) are, that the wife shall obtain the authorization of the husband, and the sanction of the judge of the district or parish in which she may reside; such judge being required to examine her separate and apart from her husband, and in case he is satisfied that the money about to be borrowed, or the debt contracted, "is solely for her separate advantage, or for the advantage of her separate or dotal property," then he shall furnish her with a certificate to the effect that he has made such examination; which certificate, on presentation to a notary, shall be his authority for drawing an act of mortgage or other act which may be required for the security of the debt contracted, and shall be annexed to such act, and said act, executed in the manner thus prescribed, shall furnish full proof, etc.

Since the passage of this statute it may well be questioned whether the doctrine laid down in the case of "Zuntz vs. Cornen" can be sustained. One particular method is provided by law by which married women may create authentic proof against themselves, and, as to all other methods, they labor under the general disabilities already referred to. An act executed in any other way than that specified will not furnish full proof against them, and will not be as binding as though executed by a *femme sole;* it must, therefore, be supplemented by testimony *aliunde.*

This view of the matter seems to have been taken by the present court in the case of "Conrad vs. LeBlanc," 29 A. 125, when it was held:

"The courts have been uniform in not holding the wife liable without proof that the consideration inured to her separate benefit, no matter what the form of the contract, or who the holder, in the absence of the statutory authorization of the judge, originating with the act of 1855."

This language is directly applicable to the case at bar, since it is not claimed that Mrs. Calhoun obtained this "statutory authorization;" and the legal inference is that she had, therefore, no authority to execute instruments which would have the same effect as though they had been executed with this "statutory authorization;" and, being without this power herself, she could not have delegated it to Wm. S. Calhoun.

It is claimed, however, that the power of attorney under which Wm. S. Calhoun acted, although impotent for the purposes stated at the date of its execution, acquired the necessary vitality by reason of the death of Meredith Calhoun, which event, as we have seen, took place before

the execution of the notes and mortgage upon which defendant's proceeding is based.

The argument upon this point is that the death of the husband produced a change in the condition of the wife, who thereby became a *femme sole*, and that this circumstance *ipso facto* vested Wm. S. Calhoun with the power which the act of procuration held by him originally purported to convey.

This position is untenable.

It is true that the death of the husband did not divest the wife of any power which she possessed before his death, and that she thereby acquired the power of a *femme sole*. It does not appear from any thing in the record, however, that she exercised the powers thus acquired. The only powers which she appears to have exercised before the execution of the notes and mortgage upon which the defendants are proceeding, were those of a married woman subject to the limitations which have been considered. In the exercise of those powers she might safely have delegated authority to contract in her name, since the law protected her by limiting her liability upon contracts made by virtue of such authority to such as could be shown *aliunde* to have inured to her benefit. It by no means follows that she would have delegated such authority without this protection, or that such delegation is to be implied without action upon her part by the fortuitous removal of the cause which incapacitated her at the time the act of procuration was signed.

The object and intent of the law requiring an examination by and sanction of the judge was to counteract the influence of the husband. In the execution of the act of procuration in question, however, the wife had no such protection; she must, therefore, be supposed to have signed said act under her husband's influence, and acted, therefore, only to the extent of her capacity under such circumstances. She took no subsequent action prior to the execution of the notes and mortgage by Wm. S. Calhoun, and it is difficult to perceive how or where he acquired any more authority than was originally vested in him.

Beyond this, it may well be doubted whether the mere recital in the act of mortgage of the death of Meredith Calhoun afforded such proof of that fact as to justify any judicial action with reference to it. The power of attorney spoke for itself, and showed that it was executed by a married woman conjointly with her husband. The power claimed by the agent was, therefore, to be construed with reference to that fact, and not with reference to his own statement unauthorized by the power of attorney, that the husband had since died, and that he, the agent, had thereby acquired additional authority.

The most, then, that can be claimed for the notes and mortgage

held by defendants is that they have the effect accorded to such instruments by the decision in the case of "Zuntz vs. Cornen," already quoted, and, under that decision, when the issue is made, as it has been made in this case, the burden is upon the party claiming, to show by evidence *dehors* the contract, that the consideration inured to the benefit of the wife.

It will be remembered, however, that this is a proceeding, on the part of the defendants, *via executiva*. That they might have changed the form of their proceeding by their answer to the petition for injunction can not be doubted, but they have not done so. This court has, therefore, either to maintain the proceeding *via executiva*, or to perpetuate the injunction.

If the proceeding *via executiva* is maintained, in view of the issue made by the petition and affidavit for injunction, it must be maintained upon evidence *dehors* the note and mortgage upon which the order of seizure originally issued. It is not pretended that this evidence is in the form of an act importing confession of judgment, or of a judgment rendered by some tribunal other than that from which the order issued. It could not, therefore, be made the basis of a judgment in conformity to the prayer of defendant's petition, or of the answer to the injunction suit. 1 R. 407; 10 A. 275, 433.

The law authorizing executory proceedings, like other statutes providing extraordinary legal remedies, must be strictly construed, and can not be extended to cover this case. See C. P. 732, *et seq.*

1 Hen. Dig., Executory Process, I, number 1, and cases there cited.

Nor is this Court authorized, of its own motion, to change the form of the proceeding and render judgment *via ordinaria*, since no such judgment is prayed for.

In the case of "Chambliss vs. Atchison," 2 A. 488, it was held that:

"Proceedings *via executiva* can not be changed into an action *via ordinaria* without the assent of the seizing creditor." And in the case of "Tildon vs. Dees," 1 R. 407, the court said:

"We might, perhaps, have proceeded to consider the case on its merits under the prayer of the defendant for a judgment *via ordinaria* so far as the minor Ann Martha Dees is concerned, for Charlotte Dees claims nothing in her own right, but the record, from the contradictory statements we find in it relative to the number of heirs left by the deceased, does not enable us to determine the portion of the claim to which the minor would be entitled as one of the heirs."

The claim set up by defendant's counsel, that Mrs. Calhoun ratified the act of Wm. S. Calhoun in issuing the note and mortgage in question, upon her return from Europe in 1870, must be governed by the same principle. It is not pretended that this ratification was in authentic

form, and it is useless to consider whether the parol evidence, introduced subject to the bill of exception taken by counsel for plaintiff in injunction, would authorize a judgment *via ordinaria.* No such judgment is asked for, and no such evidence can sustain a proceeding *via executiva.* 1 R. 407.

There is one other point to be considered. Counsel for defendants urge that plaintiff should have appealed from the order of seizure and sale, and, in support of this position, argue that said order was a definitive judgment which could only be altered or changed in one of four methods named in the Code, to wit:

New trial—appeal—action of nullity—and rescission.

An examination of the articles of the Code of Practice, under and by virtue of which alone the order of seizure and sale can issue, will readily disclose that this position is not well founded. Those articles provide other methods for changing and altering this order than those referred to, which relate to definitive judgments proper.

Article 738 provides that the order of seizure and sale may be enjoined. Articles 740, 741 provide for a summary trial of the injunction, and article 742 provides that:

" If on being required the defendant proves that the action in which the seizure has been obtained is extinct or prescribed, or that the cause of it is void, or that the debt on which it is founded is paid, remitted, or compensated, the judge shall revoke the order of seizure and condemn the plaintiff to pay costs."

It need hardly be remarked that the judge possesses no such power over ordinary definitive judgments; and it is evident that the rules provided for the revision of such judgments do not apply to orders of seizure and sale. In fact, the proceeding by injunction seems to be the particular and special remedy provided in this class of cases. It is true that an order of seizure and sale has been held to be a judgment in so far that an appeal may be taken from it, as from any order which may work an injury; and, doubtless, if the sole question raised is the insufficiency of the evidence, an appeal would answer the purpose, since the record would, in that case, contain every thing required for a decision by the appellate court; but, if the opposition is founded upon matters requiring the introduction of testimony beyond the acts upon which the order issued, a mere appeal from the original order would be an utterly vain thing as to these matters, since such an appeal could not bring them up for revision; and a party desiring to bring before this court the question of the sufficiency of the evidence on which the order issued, and other questions besides, would be obliged to resort to an appeal for the one and an injunction for the other, thus involving that multiplicity which the law abhors.

The question, however, of the effect of the order of seizure and sale as contradistinguished from a judgment was fully considered in the case of Harrod vs. Voohees, Administrator, 16 La., p. 254, in which Judge Morphy, as the organ of the court, used the following language:

"This court has frequently held, it is true, that when a judge issues an order of seizure and sale he renders such a decree as can be appealed from. If executory process is prayed for on an act importing confession of judgment, the judge must examine and decide whether the instrument unites all the requisites of the law necessary to authorize this summary proceeding. So far it is a judgment, and an appeal must lie from it, as from all other orders of court that might work an irreparable injury. A judge might erroneously make such an order on evidence not warranting the issuing of it. Such, for instance, has been the case in the very decree relied on. It was granted on a deed of mortgage executed before a justice of the peace; an officer wholly unauthorized to pass such acts, except in certain cases, none of which are proved to have existed in the premises. But such a decree is not a judgment in the true and legal sense of the term, and possesses none of its features. It issues without citation to the adverse party; it decides on no issue made up between the parties, nor does it adjudicate to the party obtaining it any right in addition to those secured by his notarial contract. If such an order was a real judgment, it would be out of the power of the judge granting it to set it aside ; after rendering this decree he would be divested of all jurisdiction, and it could be reversed only by means of an appeal or a separate action of nullity; whereas, it is every day's practice for the judge issuing such orders to set them aside, on a rule to show cause or an opposition; and in most cases the proceedings are turned into an ordinary suit in which a final judgment is afterward rendered. Such a decree then can be viewed only as giving the aid of the officers of justice to execute an obligation which, by law, produces the effect of a judgment in relation to the particular property mortgaged," etc.

The case of "Zuntz vs. Cornen," (10 A. 433) was not dissimilar to the case at bar. In that case the defendant filed an unsworn opposition to the executory proceeding, setting forth that she was a married woman and that it did not appear that the notes and mortgage inured to her benefit. It was held that she should have proceeded by injunction.

In the case at bar the plaintiff has not only raised the question of the want of authority in Wm. S. Calhoun but has also raised the question of want of consideration as to Mrs. Calhoun. The first of these questions might have been inquired into on appeal, the second could not, whilst in the proceeding by injunction both questions could be examined, but that defendants have not thought proper to turn the pro-

ceeding into an ordinary suit. As to those matters which have been examined, however, the case is properly before the court.

In concluding, it is proper that some notice should be taken of the condition of things resulting from the fact that in June, 1871, Wm. S. Calhoun became owner of an undivided half interest in the property upon which he had attempted to impose the mortgage in the name of his mother, and that it is claimed that in 1873 he conveyed that interest to his sister, the plaintiff in this suit.

The questions of the effect, as to said Wm. S. Calhoun, of his unauthorized execution of the notes and mortgage involved in this case, and of the effect, as to said mortgage, of his subsequent acquisition of the property in question, and of the alleged transfer of said property to his sister, are not now properly before the court. Whatever rights the defendants may have in the premises, whether against Wm. S. Calhoun or the said property, or both, are however expressly reserved to them and are not to be considered as affected by this judgment.

With this reservation, and for the reasons stated, the judgment of the lower court must be affirmed at the costs of the appellants.

MARR, J. I concur in the foregoing decree.

---

### CONCURRING OPINION.

EGAN, J. I think the power of attorney of Mrs. Calhoun, executed while she was a married woman, is to be measured and interpreted by her then capacity to make it, and all acts done under it are to be considered as being done by the mandatory of a married woman. It acquired no new and elastic properties or scope by reason of the death of Meredith Calhoun, the husband, and by all authority is to be viewed with greater scrutiny because executed conjointly with him. No acts or facts are shown which go to show any re-issuance or affirmance of the power by Mrs. Calhoun after her husband's death.

If the interpretation of this power argued for by the defense is correct, there would be no safety or protection for married women or their property in Louisiana, notwithstanding the provisions for that purpose of the various statutes enacted for their protection, and the long line of decisions interpreting and applying them. Far better would it be for their existence to be theoretically merged and their capacity to contract suspended altogether during the marriage, as it is under other systems of law. It has been too long and too well settled by this court, from the earliest day down to the present bench, to be now questioned, that with regard to obligations sought to be enforced against married women, the question is not so much as to the consideration as to the capacity to

enter into the contract even when entered into personally. Hence, it follows that even the holder of a negotiable note of a married woman, for value before maturity, is yet liable to have pleaded against him every defense arising from her incapacity. See Conrad vs. LeBlanc, Sheriff, 29 A. 123, and cases there cited. In the same case it was further held that even where the authorization of the judge has been obtained to enable her to contract and execute a mortgage for a certain sum and purpose, and it is executed for another sum, and either in whole or in part for a different purpose, that *whoever* seeks to enforce the mortgage can only do so by proving *aliunde*, as in other cases, that the debt secured by the mortgage inured to her separate benefit. *A fortiori*, then, is the whole matter open to inquiry for her as for any ordinary litigant, in a proceeding like the present, based purely upon the mortgage, under the general principles recognized by this court, that whatever may be the negotiability of the instrument or evidence of the debt secured by the mortgage, the latter is itself non-negotiable.

All these principles apply with still greater force to the present case, in which there is no pretense even of authorization by the judge, and where the evidence *aliunde* not only does not support, but directly contradicts the existence of the consideration named in the act of mortgage, and that the consideration of the notes and mortgage inured in the smallest degree to the benefit of Mrs. Calhoun, or her property, or that either notes or mortgage were executed for any of the objects or purposes contemplated in the power; Nevin himself, the mortgagee, who testified freely and fully in the case, does not pretend so. Indeed, if one of his statements, made to prove the defendant's case, is to be believed, an important part of their consideration was a debt incurred for moneys remitted to France during the war, and the existence of the community, and which, therefore, comes directly within the statutory prohibition of the wife binding herself for a debt of the husband, or of the community. But whether this be true, or whether, as elsewhere attempted to be shown by himself and other witnesses, the consideration was money advanced to enable W. S. Calhoun to embark his mother, without her knowledge or consent, as a partner in the commercial firm of Shackleford & Co., a purpose which, it is admitted, was wholly beyond the scope even of the language of the power of attorney under which he pretended to act, and which was appended to the mortgage as evidence of his authority to execute it, it is quite manifest that neither notes nor mortgage were executed for the purpose named in the act (i. e.), for supplies and moneys for the use of Mrs. Calhoun's plantation during the current year. Nevin himself swears that he had at the time in his hands $5000 of Mrs. Calhoun's money, that not over $3000 was needed or used during the year for her places, which were almost

wholly rented out, and even this sum was largely more than repaid by the crops received and sold during the year; while, if the evidence of his accounts found in the record is to be believed aside from other testimony, he had in his hands, at the very time of the execution of the notes and mortgage, many thousands of dollars belonging to Mrs. Calhoun, the product of the crops of other years, in addition to the $5000 admitted by him, as before stated. His own evidence, and that of his accounts alone, is, I think, sufficient to establish the existence of the most flagrant fraud, and a conspiracy to defraud Mrs. Calhoun, through the act of her son, known at the time to Nevin to be wholly unauthorized, to bind his mother for the purposes for which he himself states the notes and mortgage were executed. This knowledge is shown, not only by the terms of the power itself, but by the repeated attempts and anxiety of Nevin to have a new one executed, and by other facts and evidence in the record. The time at which the bank acquired whatever interest it may have in these notes has been left by it in a very unnecessary state of uncertainty, when it was so easy to have shown their acquisition, and that interest before maturity, had that been the fact. The fact that no reference to its books has been made, and that none of its officers or agents have been offered to testify in regard to those important facts, or any others in the cause, but that the bank has chosen to rest its case and the evidence even of the existence of any indebtedness to it by Nevin, mainly to him who is so directly implicated in the fraud and conspiracy charged, is, to say the least, unusual, and displays a remarkable want of interest in the result of the litigation. Besides, one who takes a note executed by delegated authority, even before maturity, is affected with notice, or at least put upon inquiry as to the extent of the authority; and, again, Nevin himself testifies that the notes were pledged to the bank on the very day of the maturity of one of them; as to which, at least, it can not be pretended that the bank acquired before maturity, and which it must have known was not expected to be paid at maturity, as otherwise the former holder would have held and collected it, and used the money, instead of pledging it to secure a loan. We have left also out of view altogether the well-known commercial usage, of which the bank could not have been ignorant, on the part of factors, to take country paper of this class as a security, not for moneys or supplies already advanced, but to be advanced, and which, if not advanced, or if repaid through the pledge of the crop, uniformly made at the time of execution of the instruments, the consideration would either have no existence, or be at an end. How far, if at all, this well-known usage would take this particular class of paper out of the ordinary operation of the laws relating to commercial paper, we do not consider it necessary to determine in this case;

and it is evident that, whenever acquired, that interest does not cover the whole amount of the notes, but only about $6000, besides interest. The remainder, then, when collected, would belong to Nevin, the original fraudulent mortgagee, under whatever aspect the case is viewed. Again, aside from the considerations already mentioned, were these even the notes and mortgage of a person under no legal incapacity, the bank was sufficiently put upon inquiry by the identification of the notes with the mortgage, and by the terms of that act itself, without the examination of which, as the security for their payment, it is not to be supposed that, contrary to usage and the dictates of ordinary prudence, it would have taken the notes. At all events, as before stated, the present proceeding is based purely upon the mortgage *via executiva*, and that, at least, is open to contest. I think the plaintiff's case has been fully made out upon the merits. As to whether she could in an ordinary action claim the exemption from the operation of the mortgage of that portion of the land acquired from her co-heir, William S. Calhoun, subsequent to his mother's death, or whether the estoppel which would operate against him would operate equally against the present plaintiff, we are not now called upon to decide. The case of Zuntz vs. Cornen, 10 A. 433, is not in accordance with the current of decisions of this court, but even in that case the court held, as did the present court in the Conrad case, that when the act itself bears intrinsic evidence that the maker, a married woman, exceeded her powers, executory process should not issue, and that where it does not, injunction, and not appeal, as argued in the present case, is the appropriate remedy. This must be so, or a denial of justice be operated.

The plaintiff has brought herself within the provisions enumerated for injunction against executory process in article 739 of the Code of Practice, and even if she were confined to them, must still succeed under the evidence adduced in support of her injunction. The enumeration of causes for injunction in that article refers, however, only to the injunctions without bond, provided for in the preceding article, 438, and by no means restrict or narrow the general provisions of the law authorizing injunctions for any legal cause under that head in the Code of Practice. There are many other facts, not enumerated, supporting the views here taken, but I have been induced to embark in this discussion of the case in its present shape, owing to the differences of opinion among the members of the court, and the consequent wide range which the discussion has assumed, and because my silence might otherwise be interpreted into acquiescence in views of the case I do not entertain in common with some of my brethren. I can not now recall any case which has come under my observation presenting a record of more flagrant fraud and attempted wrong through the forms of law than that now before us.

50

Calhoun vs. Mechanics' and Traders' Bank.

I am, however, content under the circumstances to acquiesce in the decree pronounced by the district judge, who has been associated with us for the trial of the case, setting aside and avoiding the executory process, and remitting the bank to a proceeding *via ordinaria*.

I therefore concur in the decree.

---

### DISSENTING OPINIONS.

DeBlanc, J. On the 27th of December, 1866, Meredith Calhoun, and his wife—Mary S. Taylor—appointed as their agent in this State, their son William Smith. The authority delegated to that agent was nearly unlimited. He was empowered to *lease, mortgage* and *sell* the property of both, and of each of said parties—" to take charge of and conduct all business affairs of every name and nature, pertaining to them in America, *whether the same related to real or personal estate,* or of any other kind whatsoever—to make, execute, acknowledge and deliver any contracts, agreements or covenants—to collect and receive any money, debt, rent or account due or to become due."

In 1869, Meredith Calhoun died: the evidence of the agency created by himself and his wife, unrevoked by her, continued—after his death— to stand on the recorder's book, a notice to the world. There it remained until the death of Mrs. Calhoun. If—from the demise of the husband— the powers so delegated and the recorded evidence of those powers had lost their effect, the fact that they thus remained, apparently at least, unchanged and unrecalled, was certainly calculated to ensnare the most vigilant, to deceive the most cautious.

In 1870, acting under that unrevoked and published authority, Mrs. Calhoun's agent borrowed for her, from James N. Nevin, the sum of $15,000. To represent that sum he subscribed and delivered, as agent, three notes of each an equal amount—two of which, the first and last maturing were transferred to the Mechanics & Traders Bank, the middle one to D. W. Moore, of Mississippi.

To secure that loan, William Smith Calhoun, as agent, mortgaged in favor of Nevin, or any future holder of the notes by him subscribed and delivered, four plantations situated in Louisiana and belonging to his mother. She was then a widow and absent from our State.

It is urged—by plaintiff—that the death of Meredith Calhoun operated a change in the condition of said deceased's wife, and that—at the very moment of his death—the mandate from both of the spouses to the son expired. This is a mistake: Mrs. Calhoun was neither interdicted nor insane, and the change—not in her condition as a principal— but in exclusively her marital state, did not destroy or impair—but, on

the contrary—enlarged and increased her capacity. As a widow, it was in her power to revoke the agency. This she has not done.

We can well understand that a change in the mental condition of the principal, that insanity and interdiction, that the marriage of a woman, who passes from single life under the authority of a husband, are causes which should and do revoke antecedent mandates—: for, one can not delegate to others the exercise of a power which is denied to him—but we are at a loss to understand why, at the dissolution of the marriage, when the widow resumes her full capacity and the unrestricted administration of all she owns, the mandate given by her during coverture, should afterwards expire against her wish, and will.

In our legislation, the capacity to contract, the limitations to that capacity, and the absolute and removable incapacities are specially mentioned and clearly defined. The authorization of the husband or of the judge is indispensable to validate the contracts of the wife—but, once perfected, those contracts survive the husband and the marriage. It would have been as useless as irrational to have declared revoked b the death of the husband, an act perfect as to the wife and which—if then revoked—the widow could renew, resuscitate and again revoke.

Mrs. Calhoun was informed of the execution by her son of said notes and mortgage; she was thus informed before and after her return from France to Louisiana, and—far from contesting—she approved and ratified expressly and tacitly, the acts of her agent—expressly, by her application for a delay fixed by herself and within which she was to sell some property to satisfy the now contested claim—tacitly, by her unbroken silence in and out of court, as to the pretended invalidity of said claim. 10 M. 526. 7 L. 17. 4 R. 134. 29 A. 212. R. C. C. 1786.

In June 1871, Mrs. Calhoun died: by inheritance and by purchase of her brother's share in the succession of their mother, plaintiff became the sole representative of the latter, and—as such—opposes and resists the demand of the Bank, on the ground already disposed of, and on the additional ground that the contract declared upon was entered into between her brother and Nevin, in pursuance of a conspiracy to defraud her mother.

As against Nevin, if he were attempting to enforce that contract, plaintiff might urge the fraud charged against him and their mother's agent. As against the Bank, which took the notes in good faith, for a valuable consideration and before maturity, that defence is untenable. Its officers only had to ascertain—from the tenor of the power of attorney and the act of mortgage—whether it *appeared* that the agent had acted within the scope of his authority. It so appears, and Mrs. Calhoun was legally bound. By the unconditional acceptance of her mother's succession, plaintiff has assumed her obligations.

In his argument, plaintiff's counsel contends "that a mortgage can not be transferred to a third party, so as to give him greater rights than the mortgagee possessed." In regard to the transfer of credits, this is not correct: third parties acquiring before maturity, often acquire more than their vendors are entitled to. The transfer—under those circumstances—vests the right of claiming—not always that which is really due, but that which *appears* to be due, by the instrument which attests the existence of the transferred credit.

The note is the principal, the mortgage an accessory—and, whether mentioned or not in the transfer of the principal, the accessory passes with it to the transferree. The Code so provides. The holder of a claim represented by a note and secured by a mortgage could not sell separately, to one the note, to the other the mortgage: they are the inseparable parts of but one contract, and—though the mortgage may be abandoned or lost—it can not be enforced separately from the claim, and by any other than the holder of the claim.

The validity and defects of the principal constitute the validity or defects of the accessory. The debt may outlive the mortgage, but the cause which destroys the debt, invariably destroys the mortgage. The equities which the obligor is precluded from opposing to the claim, can not be opposed to the mortgage.

" En principe—said Paul Pont—le privilége ne se sépare pas de la créance ; il n'a pas une existence qui lui soit propre, et il ne peut-être cédé distinctement et indépendamment de la créance. Mais si par l'effet d'une cession et d'une subrogation regulière, la créance elle même passe d'une personne à une autre, le privilége passe également et est acquis de plein droit au cessionnaire ou au subrogé.

Revue critique de Legislation et de Jurisprudence, février 1856 p. 108.

In his discussion on the same subject, Marcadé had already expressed the same views:

" Il est tout simple que la vente d'une créance comprenne—plein droit, *et sans qu'il soit besoin que le contrat s'en expliquer,* les accessoires de cette créance. * * * Le cautionnement, l'hypothèque ou le privilége qui garantissent une créance en sont évidemment des accessoires, presqu'ils ne sont rien autre chose que des moyens d'en mieux assurer l'exécution, et que—le créance tombant—ces divers droits tomberent et n'avaient plus de raison d'être. Il n'y a pas de cautionnement, d'hypothèque ou de priviléges possibles, là où il n'y a pas une créance dont ces droits seront une dépendance."

Explication de C. N. par Marcadé, article 1692.

Rev. C. C. 2645.

To sue on the notes, to enforce the mortgage given by Mrs. Cal-

Calhoun vs. Mechanics' and Traders' Bank.

houn's agent, there was no necessity of any specific transfer: in their form, the notes are payable to bearer, and the mortgage was granted in favor of *any holder* of said notes. The Bank has the required title, and no additional transfer could have added to that title. It derives its right of action, not only from the law, but from the very terms of the contract, the convention of the parties.

In the procuration from Mrs. Calhoun to her son, the most important powers were granted to the agent. He had the right to borrow, mortgage and draw: he borrowed, mortgaged and drew. Under no clause of that indefinite mandate, could Nevin have disputed, or the Bank doubted the agent's authority to create the debt, to receive the proceeds of the loan, and to dispose—as he thought proper—of every property, every right, every cent belonging to his mother.

As to the Bank, it was useless to prove a ratification by Mrs. Calhoun of the acts of her agent. She had resumed the administration of her paraphernal property, and—by an unlimited power of attorney— had specially authorized him to incur the expenses indispensable to the cultivation of her plantation. The agent declared to the notary and witnesses that the notes were furnished for exclusively that object. As to third parties, that declaration had as much force as if made by Mrs. Calhoun herself, and she was bound by the act of her agent, before and without the ratification.

Can a married woman—duly authorized by her husband—stand by the side of a commission merchant, ask him to lend her funds and make advances which she represents as necessary to cultivate, improve or save her separate property, direct him to pay those funds to a designated mandatary, and—when the merchant claims the amount thus advanced, tell him: it is true that I did borrow your money, that I borrowed it for a lawful purpose, but that money has been misapplied by my chosen agent, and—as you failed to guess that it would not enure to my benefit—you alone must suffer for the abuse of a trust created by me. I did not deceive you, my agent did; when he received and took your money, he was acting for me; under a power delegated by me, and within the scope of that power—but, in the disposition of the funds, he has exceeded or disregarded his authority? If so, a contract legal and perfect at its origin, legal and perfect as to both the creditor and the debtor, and with which the creditor has strictly complied, may be—by the fraud of the debtor's agent, converted into, and annulled as a prohibited contract.

The incapacity, or rather the capacity of the wife to contract, is limited and conditioned: she can not bind herself for the benefit of her husband, his estate or the community—that is the limitation. She can not bind herself without the authorization of her husband or of the

judge—these are the conditions. · When authorized by either, she can alienate, grant, mortgage, acquire, by gratuitous or encumbered title, and bind herself for or towards any one, except it be for the benefit of her husband, his estate or the community. R. C. C. 122, 126, 127, 1790, 2397, 2398.

The 1775th and 1779th articles of the Code of 1825, re-enacted and retained in the revised Code, leave—it seems—no doubt on that subject. The first provides that *all persons* may contract, except those whose incapacity is specially declared by law, and these are persons of insane mind, those who are interdicted, minors and married women: the other article provides that—as to the wife, her incapacity is removed by the authorization of her husband or of the judge.

R. C. C. 1782, 1786.

In and before 1855, the credit of the married women of the State had been so affected by their invariable disregard of their civil obligations, by their successful resistance to the enforcement of those obligations. that, in that year, to resurrect their destroyed credit, the legislature had to pass a special act, intended to remove the uncertainty, the risks of a contract with them, intended also to dispel the legitimate suspicion which then existed against such contracts. That act was adopted —not to restrict the already restricted capacity of married women, not to add to the limitations imposed on their capacity, but to provide a definite, an effectual mode of binding them, to increase their facilities, or—to speak more properly—to decrease the then almost insurmountable difficulties under which they were to manage their separate interest, and—more particularly—to calm the just apprehensions of those who were disposed to become their creditors.

The law, as it was before the adoption of the act of 1855, stands unrepealed, unimpaired, with this difference: when married women bind themselves according to the provisions of said act, they are placed on the same footing as a *femme seule*, and their contracts—unless attacked for fraud on the creditor's part, and in a contest with the creditor by whom the fraud has been committed—furnish full proof against them and their heirs. These are the very words of the Code, and when—in such a case—fraud is alleged by a married woman, it is incumbent upon her to prove that it was perpetrated by, or to the knowledge of the party claiming the enforcement of a prohibited contract. As to contracts entered into by married women, without the formalities prescribed by the act of 1855, they are governed by the legislation which preceded the adoption of said act, and those who deal with them with but the authorization of their husbands, must do so under circumstances excluding even the presumption that the wife is about to bind herself for what—in law—is considered as her husband's advantage or that of the

Calhoun vs. Mechanics' and Traders' Bank.

community, and circumstances which—on the contrary—are such as to induce a rational and honest belief that she is acting exclusively in her own interest, for her own and separate benefit. When the creditor has, in good faith and in strict accordance with law, parted with his money, it would—it seems—be a strange injustice to hold that he is liable for a deceit practiced upon him by both the husband and the wife, and for the future and unlawful disposition of money, over which—as soon as it is paid or handed to the wife or her agent—he can neither retain, nor exercise any control. It is otherwise—however—when instead of borrowing money for merely alleged necessities, for future use and future purposes, such as the raising of an unsown crop for the wife and on her own separate property, the wife—without the sanction of the judge, seeks to borrow money to pay a debt already contracted, a liability already incurred, for—as it is the character of the debt which—then— can alone give validity to a married woman's obligation, the party from whom she so seeks to borrow must—at his peril—ascertain that the debt was contracted, the liability incurred for her own, her exclusive benefit.

Be all this as it may: such an error—as rendering a judgment on insufficient evidence—does not authorize a resort to the process of injunction, but can and should be corrected by appeal, by a new trial, by an action of nullity or rescission. The judge who issued the writ of seizure and sale on the ground that the evidence to do so was sufficient, can not enjoin and restrain the execution of that writ on the ground that the very evidence which he so found and pronounced sufficient, was insufficient to authorize the issuance of the writ. 25th A. 539.

In this case, plaintiff has reversed the rule, and—in direct opposition to a positive law—has not only not resorted to any remedy pointed out by that law, but has resorted to a remedy repugnant to it, reprobated by our jurisprudence.

For these reasons, I respectfully dissent from the decree rendered by the majority of the court.

———

SPENCER, J. I can not concur in the opinion or decree of the court in this case.

Mary S. Calhoun owned as her paraphernal property four plantations in Grant parish. She and her husband, Meredith Calhoun, being then in France, executed before the American Consul at Paris, on 27th December, 1866, a power of attorney to their son, William S. Calhoun, in terms as follows:

" They do jointly and severally nominate, constitute, and appoint their son, Mr. William Smith Calhoun, of Louisiana, United States of America, to be their true and lawful attorney in fact, giving and by these

presents granting unto said attorney full power and authority for *them* and in their *names*, place, and stead to take charge of and conduct all business affairs of every name and nature pertaining to *them* in America, whether the same relate to property, real estate or personal, or be of any other nature or kind whatsoever. To sell, assign, and transfer any or all real estate, lands, tenements, and hereditaments *to them or either of them belonging*, or any interest therein or right thereto ; also' giving to said attorney full power and authority to *mortgage* or lease any such property as to him may seem best. To make, execute, acknowledge, and deliver any contracts, agreements, or covenants, and to sign, seal, and deliver any and all conveyances, deeds, leases, *mortgages*, or other instruments of writing necessary for the execution of the power herein granted. To collect and receive any sums of money, debts, rents, dues, or accounts now due or to become due, to appear for *them* before any courts, tribunals, or places necessary for the collection of .any such sums of money, to receive the same and full and sufficient acquittance therefor to give ; and generally to do and perform all things requisite in as full and complete a manner as if herein specially provided for."

In 1869 Meredith Calhoun died in France.

On 12th May, 1870, (the mother being then a *femme sole)* William S., the son, executed three notes as her agent under said power, each for $5000, payable to his own order as agent, and indorsed in blank, maturing on November 1, December 1, 1870, and January 1, 1871. On the fourteenth May, 1870, he, as agent of his mother, executed an authentic act of mortgage, to secure these notes, in favor of one Niven, a merchant of New Orleans, in favor of *any other holder of said notes.* In the act of mortgage it is recited that the consideration of the notes was money and supplies, furnished and *to be furnished* by Nevin, for the cultivation of his mother's plantations, of which she had the administration. Nevin pledged the first and last of the above described notes to the defendant bank. There is some dispute as to whether the bank obtained the two notes before the maturity (November 1) of the first one. I think the evidence is conclusive that the bank held both the notes on or before the fourth November (the maturity of the first one), and, therefore, *did not acquire it after its maturity,* and, therefore, it is not subject to equities in the bank's hands.

In January, 1871, the bank sued out executory process on these two notes; but the entire record was burned with the courthouse in April, 1873, except the two notes.

In June, 1871, after returning from France, Mary S. Calhoun died, leaving the plaintiff, Ada, and her son, William S., as her sole heirs, who accepted her estate unconditionally. In 1873, Ada Calhoun purchased the interest of William S. in the mother's succession. In April, 1875, the

bank commenced *de novo* its executory proceeding, and Ada Calhoun brought this injunction suit. The grounds of injunction are numerous. The main points are:

1. That the evidence on which the judgment of seizure and sale was rendered is not authentic.

2. That Mrs. Calhoun was without capacity to give the power of attorney to her son.

3. That she was without capacity to alienate or mortgage her real estate without the authorization of the judge.

4. That the power of attorney did not confer on William S. any other authority than that of administration, and was revoked by the death of the husband.

5. That the notes were without consideration, and that William S. Calhoun and Nevin colluded together to defraud Mrs. Calhoun. That the money procured by said notes was not used for her benefit, but put by William S. into the firm of Shackleford & Co., at Colfax, and that the bank acquired them after maturity, and that the notes and mortgage were void.

There are a few vital points which I propose to consider, and which, in my opinion, are decisive of all these questions.

1. The insufficiency, or non-authenticity of the evidence upon which the decree in this case was rendered can not be set up as ground of injunction. The only remedy was by appeal. I take it to be well settled that a party can not resort to injunction where he has relief by appeal. See 13 A. 111; C. P. 605—607; 14 A. 656; 6 R. 58; C. P. 556; 12 M. 691.

But I do not admit that, in point of fact, the evidence was insufficient to warrant the fiat of the judge. The only suggestion of insufficiency is that the mortgage by way of recital states that the indebtedness is for money and supplies "*furnished and to be furnished*," and that, therefore, there must be authentic proof showing that the supplies " to be furnished," had been actually furnished. The answer to this objection is that the mortgage was given to *secure the notes*, and was in favor *not of Nevin only*, but " *of any other or future holder* " of these notes. If the consideration of the notes, in the hands of a third holder, could not be inquired into—if the state of accounts between Nevin and Calhoun could not affect the right of such holder, why should it affect his rights as holder of the mortgage, which, upon its face, is given as security *to him* as a *future holder* of the notes? The mortgage in this case is one direct to the bank as " *a holder* of the notes," and, in that respect, does not differ in its legal aspects from one granted to it specially, after it became the *bona fide* holder of the notes. If the maker of a note is precluded from showing its invalidity—if the law presumes a consid-

eration and will not admit proof to the contrary, for the purpose of defeating the note, will it admit *such proof* for the purpose of defeating a mortgage given *in favor of the holder* of that note? If there be in law or fact a good consideration, actual or presumed, for the note, then I contend there is, *ex necessitate rei*, a good consideration for the mortgage. That if the consideration can not be inquired into to defeat the note, it can not be to defeat the mortgage. If the mortgage, in this case, had been simply in favor of Nevin, personally, and *not in favor of future holders* of the notes, the case would have presented a different aspect, and have fallen within the scope of some of our decisions to the effect that a mortgage securing a negotiable note is not itself a negotiable instrument. In my opinion, these decisions are in direct conflict with the spirit and letter of the Civil Code. A mortgage is not an independent contract. It is a mere accessory of a principal. It is not separable from it, and goes with it as an incident. 3251—3252. "The sale or transfer of a debt includes every thing which is an accessory to the same; as suretyship, privileges, and mortgages." C. C. 2615. A person can not transfer a mortgage note and retain the ownership of the mortgage, no more than he can remove the substance without moving the shadow. In my opinion, a mortgage being a mere incident, a simple accessory of a debt, partakes necessarily of its nature, and is negotiable or not, just as the debt to which it adheres is so or not. See 27 A. 561; Story on Bills, sec. 191. I, therefore, think that where the consideration of the note can not be inquired into to defeat the note itself, it can not be to defeat the mortgage securing that note. In other words, if there is, by conclusive presumption of *law*, a good consideration for the note, a mortgage given to secure it can not be defeated by proof that there was, *in fact*, not a good consideration for it. The bank being a third holder, in good faith, of these notes, the question as to whether the money "to be furnished," was or not actually furnished, is an immaterial one, since it could not be raised, as against the bank, to defeat either the notes or mortgage. If immaterial, it was not necessary that it be proved before taking the order of seizure. I think, therefore, that there was authentic and sufficient evidence to support the judgment of seizure, even if this question could be raised by injunction.

2. The next question is as to the capacity of Mrs. Calhoun to grant to her son the power of attorney in question. To me it is manifest that there is prevailing a great misapprehension as to the nature and extent of the incapacities of married women under the laws of Louisiana.

There is but one *general incapacity* under which she labors, and that is her inability to contract without the authorization of her husband, or, in his default, of the judge.

*When she is joined and authorized by her husband* she has precisely *the same* legal capacity as *any other woman*, with *one single exception*, to wit: that she can not bind herself or her property for the debts of the community, or of the husband. When so authorized, therefore, her incapacity is purely relative, and limited to this one class of contracts. When so authorized, she can donate, sell, encumber, or mortgage her real estate. C. C. 122. She can contract debts for her own benefit, or become security for the debts of her children, her father, mother, brother, sister, or even of strangers. In fine, she can make any contract she pleases, except for the benefit, or as security of, her husband and the community. See Hellwig vs. West, 2 A. 1; 10 A. 433; Farrell vs. Yoe, 2. A. 903; 5 A. 569. It is now settled that she does not need the authorization of the judge to grant mortgages. The only effect of such authorization is to estop her from asserting that the debt was for the benefit of the husband.

She can at any time resume the administration of her paraphernal property, not only without consent, but in defiance of the wishes of her husband. See C. C.

It is, therefore, perfectly manifest that at the time this power of attorney was executed Mrs. Calhoun had capacity, with the authorization of her husband, to sell, lease, and mortgage her real estate in Louisiana, and to contract debts for her own benefit, or for the benefit of anybody else than her husband. If she had this power herself, where is the law which forbids her conferring it, with the authorization of the husband, upon her agent and son? No such law exists in the statutes of Louisiana. Her husband joined and authorized her in the execution of this power of attorney.

She owned the property, and having the right to administer it herself, and to sell it, or mortgage it (provided it was not for her husband's debts), she could do these same things by an agent. See 2 A. 890. Of course, her agent had no greater power than she had, but we have seen she had those powers, subject to said restriction. She even had the power to become a "public merchant," and, therefore, with her husband's authority, could have become a partner of Shackleford & Co.

3. Does the power of attorney, as quoted above, confer on William S. Calhoun authority to sell and mortgage her real estate, to contract debts, and secure the same? Its language means as much, or else it means nothing. It distinctly recites that they "*jointly and severally*" appoint him agent, with power "to sell, assign, and transfer any or all real estate, etc., *to them* or *either of them belonging*," and "*to mortgage*" the same, etc. It is idle to argue in the face of these terms, as do the counsel, that "this procuration is, therefore, simply one by the husband and

gave the agent, so far as the wife's property is concerned, no other power than that the husband himself had, that of administration."

4. Did the death of her husband, in 1869, revoke this procuration so far as she was concerned? The Code, article 2996 (old number), tells us that a procuration expires "by the change of condition of the principal," but nowhere tells us what constitutes such change of condition.

We must, therefore, have recourse to reason and authority to ascertain. The change of condition intended evidently refers to cases where the capacity of the party undergoes a diminution. If a person *ceases* to possess capacity to do a particular thing *himself*, of course he can not do it by another, as his agent; and any previously conferred power to such agent, would, of necessity, be revoked, for the creature can not be greater than the creator. But why an increase or addition to the capacity of the principal should so operate, we are at a loss to see. In Reynolds vs. Rowley, 2 A. 893, this court held that a power of attorney, executed by a single woman, who on marrying retained the administration and control of her property, was not revoked by the marriage. The court say:

" According to Judge Story, the reason that, as a general rule, marriage revokes powers of attorney previously given by the wife, is that the power of constituting an agent is founded on the right of the principal to do the business himself; and, when the right ceases, the right of constituting an agent must cease, also. Story on Agency, 501. *In this case the law gave Mrs. Rowley the right to administer after marriage, without the assistance of her husband, and, therefore, the rule does not apply.*" Certainly, if becoming a married woman does not revoke, necessarily, previously given procurations, becoming a *femme sole* never can.

5. Having thus concluded that Mrs. Calhoun had the capacity to give the procuration to her son to contract debts (other than for the husband's benefit) and to grant mortgages to secure them ; and that she did in fact grant him those powers ; and, finally, that the powers so granted were not revoked by the death of the husband or otherwise, we find that in May, 1870, *after she had become a femme sole,* her said agent procured from Nevin large sums of money, and executed the notes sued upon, securing them by mortgage. It is shown that she was advised of the execution of this mortgage after returning from France and made no objection thereto.

The plaintiff lays much stress upon the fact that the mortgage recites this money was to be used for planting purposes, when in point of fact the agent diverted the greater part to the mercantile ventures of Shackleford & Co. What difference does that make to the holder of

these notes? The power of attorney gave the agent almost plenary powers, and it was no part of the duty of persons lending the money or taking said notes to follow up Wm. S. Calhoun to know what he did with the money. It was enough for them to know he had the power to borrow it. It was none of their business if he abused his trust. Mrs. Calhoun is the proper person to bear the loss if her agent was unfaithful.

6. There is no disputing the fact that under cover of this power of attorney, giving absolute and almost unlimited disposal of her estate to her son, she put it in his power and enabled him to procure *every dollar* of the money represented by these notes. Good conscience and equity as well as law forbid that she or her heirs should now be heard to say they were given without consideration. It is a proper place and occasion for applying the familiar legal maxim that he who by his conduct and representations has put it in the power of another to do a wrong, must bear the loss consequent thereon.

We therefore refrain from entering into the lengthy discussions of counsel on this question of consideration, and content ourselves by saying that there *is no allegation or proof that any part of the notes sued upon was a debt of the husband;* that Mrs. Calhoun was a *femme sole* acting by a duly authorized agent in giving them, and when advised made no objection thereto ; that she and her heirs, and above all others, the said Wm. S. Calhoun and *those claiming under him,* are estopped and precluded from pleading said Wm. S. Calhoun's misconduct as a defense to said notes. I confess my utter inability to understand or appreciate the process of reasoning which can exempt Wm. S. Calhoun's half of these four plantations from responding to this debt. If his mother's estate is not bound, because he was not authorized to bind it, he is personally bound. If he granted a mortgage on property not his own to secure his individual debt, then, by art. C. C. 3304, "this mortgage shall be valid if the debtor should ever after acquire the ownership of the property, by whatever right." By the death of his mother in 1871 he did afterward acquire one half of this property, and the mortgage attached to it and could not be defeated by a subsequent sale in 1873 to his sister, the plaintiff. I have carefully examined the record in this case, and must say I do not find that evidence of flagrant fraud my brothers speak of. I think the fraud, if any, is rather on the side of plaintiff and those under whom she claims.

I think the case is clearly with the defendants, and that the injunction should be dissolved, with damages.

MANNING, C. J., recused.